J-S75015-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: M.D.L. A/K/A M.L., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.B., FATHER | No. 1994 EDA 2014 |

Appeal from the Decree June 19, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000206-2014
CP-51-DP-0002277-2012
FID: 51-FN-003419-2012

BEFORE:  ALLEN, J., LAZARUS, J., and MUNDY, J.

MEMORANDUM BY MUNDY, J.:                    **FILED JANUARY 16, 2015**

Appellant, A.B. (Father) appeals from the June 19, 2014 decree involuntarily terminating his parental rights to his son, M.D.L., born in December 2012.[1]  After careful review, we affirm.[2]

The trial court aptly set forth the factual and procedural history of this case as follows.

---

[1] By separate decrees entered on June 19, 2014, the trial court involuntarily terminated the parental rights of M.D.L.'s mother, K.E.P. (Mother), and the putative father, D.L.  Neither K.E.P. nor D.L. filed notices of appeal, and they are not parties to this appeal.

[2] The Child Advocate did not file an appellee brief with this Court.  During the termination hearing, the Child Advocate made a closing argument in which she supported the involuntary termination of Father's parental rights.

On December 17, 2012, the Department of Human Services ("DHS") received a general protective service report ("GPS") alleging that [M.D.L.], was exposed to illegal substances in utero and that [] Mother tested positive for cocaine at the delivery. On December 19, 2012, Mother was discharged from Albert Einstein Medical Center; however, [M.D.L.] remained in the hospital until his discharge on December 20, 2012. DHS obtained an Order for Protective Custody ("OPC") for [M.D.L.] and placed him in foster care[.]

On January 8, 2013, [M.D.L.] was adjudicated dependent and committed to DHS. In a permanency review hearing[] held on March 26, 2013, and June 26, 2013, the [trial] court ordered [M.D.L.] to remain committed to DHS. In a permanency review hearing held on September 18, 2013, the [trial] court ordered that [M.D.L.] must remain committed to DHS and found that [M.D.L.]'s putative father, D.L., was not [M.D.L.]'s biological father. In the same hearing the [trial] court ordered DHS to search for [M.D.L.]'s biological father.

On October 24, 2013, in a permanency review hearing DHS informed the [trial] court that Father had reached out to DHS indicating he may be the father. The [trial] court ordered Father to have a paternity test, which was scheduled to take place on November 6, 2013. The test's results determined A.B. to be [M.D.L.]'s biological Father. Father was notified of the results [i]n January 2014, but a Family Service Plan ("FSP") was developed for Father by DHS on November 11, 2013. Father's FSP was mailed by DHS and received by him. Father's FSP objectives were to participate in an evaluation assessment for drug/alcohol abuse; to comply with all treatment recommendations; to maintain and occupy suitable housing for [M.D.L.], with suitable space, heat and all other operable utilities; and provide authorization forms to allow DHS and the provider agency to obtain copies of the evaluations

- 2 -

and progress reports; to enroll and regularly attend General Equivalence Diploma classes ("GED"); or a job training program; to attend job counseling and referral sessions, to complete parenting education classes; and to participate in placement activities and visit [M.D.L.] regularly.

On January 21, 2014, in a permanency review hearing, the [trial] court found Father had not complied with his FSP objectives. The [trial] court found reasonable efforts on behalf of DHS, and scheduled a contested Goal Change/Termination hearing for April 11, 2014.

Trial Court Opinion, 8/18/14, at 1-2.

On April 29, 2014, the Philadelphia Department of Human Services, Children and Youth Division (DHS), filed a petition for the involuntary termination of Father's parental rights. On the same date, DHS filed a petition for a goal change to adoption. A hearing was held on the petitions on June 19, 2014, at which time M.D.L. was 18 months old and had been in placement since his birth. DHS presented the testimony of Latoya Hermitt, a caseworker, and Father testified on his own behalf by telephone from the State Correctional Institution (SCI) Chester, where he had been incarcerated since before M.D.L.'s birth. On June 19, 2014, the trial court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[3] On July 9, 2014, Father timely filed a notice of

_____

[3] In addition, on June 19, 2014, the trial court changed M.D.L.'s goal to adoption. Father does not raise any issues on appeal with respect to the goal change order.

- 3 -

appeal and a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i). Subsequently, on August 18, 2014, the trial court filed its Rule 1925(a) opinion.

On appeal, Father presents the following question for our review.

> Whether the trial court committed reversible error when it involuntarily terminated Father's parental rights where such determination was not supported by clear and convincing evidence under the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8)?

Father's Brief at 4.

We review the termination decree according to the following standard.

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re R.J.T.*, 9 A.3d 1179, 1190 ([Pa.] 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; [*In re*] *R.I.S.*, 36 A.3d [567,] 572 ([Pa.] 2011) [(plurality)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id*.; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 ([Pa.] 2011); *Christianson v. Ely*, 838 A.2d 630, 634 ([Pa.] 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id*.

- 4 -

> As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, [**supra**] at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. **In re Adoption of Atencio**, 650 A.2d 1064, 1066 ([Pa.] 1994).

**In re Adoption of S.P.**, 47 A.3d 817, 826–827 (Pa. 2012) (parallel citations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of

best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted), *citing* 23 Pa.C.S. § 2511. The burden is on the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, we review the decree pursuant to Section 2511(a)(1) and (b), which provide as follows.

### § 2511. Grounds for involuntary termination

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

...

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical

> care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511; *see also In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*) (stating that, this Court need only agree with any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights), *appeal denied*, 863 A.2d 1141 (Pa. 2004).[4]

With respect to Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008), *citing In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006).

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her

---

[4] Notably, Sections 2511(a)(5) and (8) do not provide a basis for the termination of Father's parental rights because Father was incarcerated at the time of M.D.L.'s placement; therefore, M.D.L. was not removed from Father's care. *See In re C.S.*, 761 A.2d 1197 (Pa. Super. 2000) (*en banc*); *In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010).

conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*Id.*, *quoting* ***In re Adoption of Charles E.D.M.***, 708 A.2d 88, 92 (Pa. 1998).

In **S.P.**, our Supreme Court discussed ***In re Adoption of McCray***, 331 A.2d 652 (Pa. 1975), a case wherein the Court considered the issue of the termination of parental rights of incarcerated persons involving abandonment, which is currently codified at Section 2511(a)(1). The **S.P.** Court stated the following.

> Applying in **McCray** the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." [**McCray**, *supra*] at 655. We observed that the father's incarceration made his performance of this duty "more difficult." *Id.*

**S.P.**, *supra* at 828. The **S.P.** Court continued by stating the following.

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. **Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child.** Where the parent does not exercise

> reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.
>
> [**McCray**, **supra**] at 655 (footnotes and internal quotation marks omitted).

*Id.* (emphasis added); **see also In re B.,N.M.**, 856 A.2d 847, 855 (Pa. Super. 2004) (internal citations omitted) (stating that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child"), *appeal denied*, 872 A.2d 1200 (Pa. 2005).

With respect to Section 2511(b), this Court has explained the requisite analysis as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. **Id**. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. **Id**. at 63.

**In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010).

On appeal, Father argues that DHS failed to prove by clear and convincing evidence that he "refused or failed to perform parental duties"

pursuant to Section 2511(a)(1). Specifically, Father asserts that he "attempted to utilize the resources available to him in prison in an effort to pursue a relationship with his child, notwithstanding the fact that Father's paternity was just confirmed in January of 2014. In fact, Father has attempted to establish a relationship since he presented himself to DHS as a possible father in August of 2013[.]" Father's Brief at 12. Upon review, we discern no abuse of discretion by the trial court in terminating Father's parental rights pursuant to Section 2511(a)(1).

The testimonial evidence reveals that M.D.L. was placed in the custody of DHS upon birth in December 2012, at which time Father was incarcerated. N.T., 6/19/14, at 7, 17. DHS believed that another man, D.L., was M.D.L.'s natural father until Father advised by letter in August of 2013, that he could be M.D.L.'s father. *Id.* at 7-8. Latoya Hermitt, the DHS caseworker, testified that Father's paternity test was scheduled for November 6, 2013. *Id.* at 14. It is undisputed that Father learned the paternity test result confirming his parentage in January 2014. Trial Court Opinion, 8/18/14, at 4; N.T., 6/19/14, at 14. However, Father testified he learned Mother was pregnant before he became incarcerated. N.T., 6/19/14, at 18. Father testified on cross-examination by the Child Advocate as follows.

> Q. So you said you had a conversation with mom when she was pregnant?
>
> A. Yes, that was before she even was showing….

Q. But at that point you obviously knew it was a possibility that you were the father?

A. She was with other dudes, I was with other females, you know, … she came to me, I told her, I said, if [the unborn child is] mine I will take care of him.

*Id.* at 19.

The trial court found Father's conduct warranted termination pursuant to Section 2511(a)(1) because, in part, "[i]t took Father eight months from the birth of his son before he decided to contact DHS to request a paternity test, although he knew there was a good possibility he was the [f]ather due to his conversation with [M]other during her pregnancy." Trial Court Opinion, 8/18/14, at 9. We agree. Moreover, Father was not relieved of his parental duties before his parentage was confirmed by the paternity test.

The testimonial evidence reveals that Father failed to perform his parental duties within the first eight months of M.D.L.'s life and all of the months thereafter. Hermitt testified that Father has never sent any cards to M.D.L., including, but not limited to, M.D.L.'s first birthday. N.T., 6/19/14, at 13. Further, Father never asked to have visits with M.D.L., has never asked how M.D.L. is doing, and he has never provided financial support for M.D.L. *Id.* at 9, 13. Father requested a picture of M.D.L. one time, in May 2014. *Id.* at 9. As such, the testimonial evidence overwhelmingly demonstrates that Father failed to perform his parental duties during

- 11 -

M.D.L.'s entire life, which was in excess of the requisite six-month period prior to the filing of the termination petition. Rather, the evidence demonstrates that, when M.D.L. was eight months old, Father started to display a "merely passive interest in the development of" M.D.L., which does not satisfy his parental duties. *See B.,N.M.*, *supra*.

Father testified he became incarcerated near the end of 2013, for a crime involving controlled substances, and his maximum sentence is June 2015. N.T., 6/19/14, at 17, 19. Father testified that, if he is released on parole, he will reside in a halfway house. *Id.* at 17-18. Father testified he completed a drug program while in prison, and he has signed up in prison for a parenting class. *Id.* at 20. Father testified, "I want to step up and be the father of this kid, like, you know, take care of him." *Id.* at 18.

We are unpersuaded by Father's desire to start performing his parental duties when M.D.L. was eighteen months of age, after M.D.L. has lived all of those months with his foster mother, with whom Hermitt testified M.D.L. is bonded. *Id.* at 11-12. In contrast, Hermitt testified that M.D.L. does not know Father at all. *Id.* at 11. Based on the foregoing, we conclude that the trial court properly terminated Father's parental rights pursuant to Section 2511(a)(1).

In light of the requisite bifurcated analysis in involuntary termination cases, we next review the decree pursuant to Section 2511(b). With respect

to the relevant bond analysis, our Supreme Court stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013) (citation omitted). Moreover, the Court directed that, in weighing the bond considerations pursuant to section 2511(b), "courts must keep the ticking clock of childhood ever in mind." The Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail … the result, all too often, is catastrophically maladjusted children." *Id.* at 269.

As mentioned above, in this case, M.D.L. does not know Father. N.T., 6/19/14, at 11. M.D.L. shares a bond with his foster mother, to whom he looks to meet his needs. *Id.* at 11-12. Hermitt testified that M.D.L. would not suffer any irreparable harm if Father's parental rights are terminated because M.D.L. "has never met his father or had any contact with him." *Id.* at 12-13. As such, we conclude that the testimonial evidence supports the trial court's decision that terminating Father's parental rights would best serve the developmental, physical, and emotional needs and welfare of M.D.L.

Based on the foregoing, we conclude the trial court did not abuse its discretion or commit an error of law when it involuntarily terminated Father's

parental rights pursuant to Section 2511(a)(1) and (b).  **See *S.P.***, ***supra***.

Accordingly, we affirm the trial court's June 19, 2014 decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/16/2015